form that was approved by the appropriate insurance department did not permit conversion after the age of 70. So there was a mistake in the way the policies were sold. When you say insurance department, are you talking about something within Lincoln Life or law? Within law. These policies were issued on Florida forms and all insurance policies have to be approved by the insurance department or whatever the state is and the form that was approved here allowed for conversion benefits up to the age of 70 or the end of the 10-year term, whichever was earlier. So these policies should not have been sold to this particular insured because he was 75 at the time. Mr. Wilson, he had the option to sell policies from other companies that wouldn't have had this problem, but he sold these policies. It was a mistake. In the underlying lawsuit, what was the underwriting policy or underwriting procedure for the insurance company for Lincoln to review what the salesman had done, the agent had done? Was there some process by which they would verify information and verify representations about the insurability? Let me be clear. There's nothing wrong. If you want to buy this policy, for example, if you think that you're not going to live beyond 10 years and you're not really going to need to convert the policies, it could make perfect sense to buy these policies because the premiums were cheaper. If you're looking to make sure that you have these policies at the end of the 10 years, these probably weren't the right product for you. But the agent, James Wilson, his job is to determine what his client needs and make sure his client gets the right policy. In the underlying case, the claim against Lincoln Benefit was that these policies should be convertible. They should get the benefit of what they thought they were buying. They won that case. In this lawsuit, Lincoln Benefit, particularly after seeing what happened through the underlying lawsuit, Lincoln Benefit brought a lawsuit against Mr. Wilson because he completely failed to do his job. He was obligated to know what his clients needed. He was obligated to know what the terms of the product were that he was selling. He was obligated to read the product before he delivered it to the insured. He didn't do any of that. And because he didn't do any of that, that was one of the reasons that Lincoln Benefit found itself in a lawsuit with its policyholder. And you permitted him, if I understand your argument here, you permitted him to use a policy form that was not authorized, statutorily authorized. So the insured should bear the brunt of that or the agent should bear the brunt of that. The form was authorized. I thought you said it was authorized but it was sold to be converted at 70 instead of 75, but the approved form was at 75. Is that right? The form provided that the policy could be converted at the end of the 10 years or your 70th birthday, whichever comes first. If he was 75 when he got the policy, that conversion right didn't really exist because the earlier of those two things had already occurred. Your argument is that what was sold was not an approved? No, it was approved. What I'm saying is Wilson had no ability to change those terms because the conversion provision in the policy was what the company sells. As I read the record, Wilson didn't change those terms. It was your company that did it. Well, this is the gist of our case. In the underlying case, one of the theories and the primary theory that went to the jury on why these policies should be deemed convertible when sold was because that was what Mr. Wilson promised to the policyholders. They won that case. So the jury found because the agent represented that these policies would be convertible, they got the representation. Exactly. Why wouldn't race judicata apply to that? That's the same fact. That's the same issue. Not race judicata, excuse me, collateral estoppel. It's the same issue. It's not the same issue because the question in the underlying case was whether Wilson was our agent. The jury found that he was our agent. It's a separate question of whether he breached the he was deemed to be our agent and we are stuck with the errors that he made vis-a-vis the policyholder, he is not off the hook with liability to us. Let me give you an example. So in the first case, you said he wasn't your agent and now you're saying he is. No, I'm saying the jury found that he is. We said that he wasn't our agent. He was actually their agent. The jury found that he was our agent. We're not trying to undo that finding. He has an agency agreement with us, whether he's an independent agent or a captive agent, his conduct is governed by an agency agreement and he breached that agency agreement. Let me explain to you what I mean. The conduct that you're saying that was the action that breached the agency agreement is the same conduct that was at issue in terms of the creation of a convertible policy. You're saying he wasn't authorized to do that. Correct. He was not authorized to misrepresent the policy. The first case said he was authorized to do that. No, the first case said that he was our agent and they're entitled to rely on the statements of our agent. This case says he wasn't authorized. Let me give you an easy example. If a UPS driver causes an accident and the party who's injured brings a lawsuit, there's a good chance that UPS will be on the hook for the harm to that injured driver. If UPS later on fires the driver because he was drunk and speeding and the driver sues UPS, he's not going to be able to say the finding of liability against you with respect to that third party absolves me of the consequences of my drunk and whatever else because he passed along information that you authorized him to pass. Yes to the first part, no to the second part. We did not authorize him to misrepresent the policy. We did not authorize that. The jury in the underlying case never had to consider whether he was breaching his agency agreement or not. The only thing that was germane to that case was whether he was our agent and the jury found that he was. Therefore, Lincoln Benefit was on the hook to the policyholder. But the question of whether Lincoln Benefit authorized the agent to do what he did, that was never before the court. There's a difference between agency and breaching the agent agreement. You can be, for purposes of a third party, the principal will be on the hook for anything that the agent does that's within the scope of the agency agreement. So that protects people like the policyholders in the underlying case because they think this guy is doing what he's supposed to be doing and they're entitled to get the benefit of that. They can rely on that. But if he's not doing what he's supposed to be doing and he's breaching his agreement, the principal still has the ability to go after the agent for that breach. And in this case, those errors ended up, it was about a $15 million premium swing that are the damages to Lincoln Benefit in this case. Suppose the principal ratifies what the agent did. Does that eliminate the ability of the principal to go after the agent? It could. It could. Doesn't it under Nebraska law under the Barta case that Judge Kopp cited? Yes. I mean, ratification can. I don't think ratification happened here is what I'm saying. But if it did happen, then it would eliminate the ability to go after the agent. Yeah. If there's a ratification, then yes. So then it comes down to whether question two by the jury in the first case is finding a ratification. Agree with that? I know not completely. I do think if the jury found that the company ratified everything that Mr. Wilson did, that could... Not everything. If it ratified the offering of a convertible policy. Isn't that what really you're saying he did wrong? Well... And in question two, ratify that by finding that the company agreed in the facts that the policy would be convertible. The jury was never asked to consider whether that facts constituted a ratification. The question of ratification came up with respect to some of the other questions in the jury verdict form, but the jury was not asked to determine whether the facts was a ratification. But in substance, wasn't that... I don't think so. Why isn't that in substance what they found when they concluded that the facts... Modified the subject term policy. Gave plaintiff the right to convert. Why didn't that ratify Wilson's offer to convert? Offer of a policy with the ability to convert. I think there are two problems with that finding for purposes of collateral estoppel. First of all, it's inconsistent with the first theory. The first theory is that the policies were convertible when sold. The alternative theory was that the facts modified non-convertible policies to make them convertible. That inconsistency... That's how the jury was instructed. And I'm not blaming the jury, but what I'm saying is for purposes of collateral estoppel, we have an inconsistent finding and we don't know which was necessary to the judgment because we have two findings that can't be reconciled. Why wouldn't we read it to say the jury was told to answer both questions so it found that both were true? I don't think both can be true because either they were convertible when sold or they were modified to become convertible. And you can't have both. The jury found that they were both... It's clear the jury wanted the policyholders to win. I see that. Doesn't the second question necessarily, the answer necessarily mean they found that the modification part is inconsistent with the first part or not? Yes. I think yes, that's the upshot of it. But for purposes of collateral estoppel, I don't think that means we don't have a right to go into court and sue Mr. Wilson for his breach of his agency agreement. Well, go ahead and explain that. If the second question means that the jury found that the company by its facts gave the plaintiffs the right to convert, why didn't that ratify Wilson Wilson's act of giving the plaintiffs the right to convert? The Mr. Wilson, I think, would be perfectly within his rights to argue causation as a defense in this case. He can say, wait a second, it's not all me. You guys also sent this facts and that's part of your own problem and part of your own damages. That's fair game, but not as a matter of collateral estoppel. The jury's finding of the facts was not... The finding with respect to the facts is a different issue than whether Mr. Wilson breached his agency agreement. The jury was never asked to consider if that facts constituted a ratification of the policies being sold with conversion rights. The jury wasn't asked to determine ratification. It would be inappropriate for the district court, it was inappropriate for the district court to say that the jury found ratification and therefore... What do you think ratification means? If the jury found that the company gave a right to convert and what you're complaining about Wilson doing was that he offered a right to convert, what more is there to finding a ratification than that? If we're here saying this could have been a ratification, that's not how you can decide a collateral estoppel issue because there has to be a finding that the jury actually made a ratification before that would become a bar to our claims against Mr. Wilson. I know, I'm asking what more would they have had to find to conclude that there was a ratification? What more would they have to find beyond finding that the company in its facts gave the plaintiffs a right to convert? I think if the... Perhaps if all of the issues with respect to Mr. Wilson's breach of his agreement were part of the case, if Mr. Wilson was part of the case, if there were claims against Mr. Wilson in the underlying case, then the jury's finding maybe it could be a ratification but I think you need to have, that has to be presented to the jury, the question of ratification has to be presented to the jury and it wasn't. That was presented as an alternative theory if they found that the policies were not convertible when sold. So I hear you're saying... You haven't identified anything else that needed to be presented in order for the jury to find ratification. I think what needed to be presented is the jury would have to be asked to determine ratification. They would have to be asked to determine ratification. There's not an additional fact that would need to be found, they just need to answer the question. Right. For it to be a finding that collaterally stops a future claim, yes. If they were asked that, could they have found that this was a ratification? Yes, they could have but they weren't asked to do that. That's my point and if they weren't asked to do that, the second court can't come in later on and say that the same issues were decided because that issue was not put before the jury. Even if your theory is correct, what is the essence of the 15 million dollars in damages you seek from Mr. Wilson? This policy provided a certain premium level for the first 10 years. After that 10 years, the premiums went way up. It was a term policy. I understand all that. Okay, if the policies were convertible, then the premiums would not have gone up as much and the amount, the differential was 15 million dollars. It still has to do basically with whether you're on the hook or not to the insured in this case. Well, we were on the hook. We paid the 29 million dollars in death benefits and the damage is that we should have had x amount of premium to use to pay that, but we had y which was a lot less than x. That was the damage. Thank you. Thank you, Mr. Gosselin. Mr. D'Antonio. Yes, your honor. Thank you. May it please the court. My name is Dennis D'Antonio. I represent Mr. Wilson in this case. I also tried the underlying case and the court in this case had the entire record of the underlying case which it required before it decided any of the motions. Addressing my colleague's arguments though, the facts of how these policies come into existence as tried to the jury have some relevance on all of the argument that is being made. Mr. Wilson did not sell this specific form contract because it wasn't in his hands as he was selling the policy to the insured. The way it actually worked is he goes out to an insured representing different products, obtains an application from the insured as to what it is that the insured wants in coverage and then he submits it through an intermediary to Lincoln Benefit Life who then agrees to the terms. Mr. Wilson's testimony was the policy was sold by Lincoln Benefit Life with him as an intermediary to have conversion after 10 years which conformed to what the purchaser's requirements were. It wasn't until months later that the insurance company after accepting almost a million dollars in premiums finally issues the contract, the contracts which are the subject of this suit. Those contracts were received by the insured. There's evidence that they frequently go into a file at that point, don't get looked at, but in this particular case the CFO of the insured, a person named Zuri Sultan, read the policies and he had a question as to how this policy would convert because of that 70-year requirement which was not consistent with what Lincoln Benefit was originally offering. And Mr. Wilson then received an inquiry from Mr. Sultan that he transmitted directly to Lincoln has to come from the carrier. The carrier at that point could have said and should have said, if that's their position today, that these policies do not have conversion rights. At that point the coverage was only six months old. If there was a dispute regarding conversion rights which was a material term, the insured had options at that point to reject the offer, ask for the premiums back, and accept one of the other offers that were being made by a different carrier that gave them the requirements of the conversion rights. Instead, and what wasn't discussed here this morning, Lincoln Benefit has a policy. On the front page of the policy it says the terms of this contract can be changed only by an officer of the company and the change must be in writing. And it's been our contention that the policy that was issued six months after it was sold wasn't the correct language. Lincoln Benefit selected that policy. If it didn't conform to Florida law, that's Lincoln Benefit's selection of the policy. Wilson has no role in selecting the actual contract that is sent. So when this, we say, mistake was discovered and that the form they used didn't give the conversion rights because the applicant was already 70 years old at the time it was sold, the inquiry was made to the carrier and the carrier could have said, no, you're wrong, there are no conversion rights, in which case the premiums probably would have had to have been returned and the insured would have gone elsewhere. What does this have to do with the issues before us? I'm sorry, go ahead. Because Mr. Wilson didn't do any of the selection of the policy or the contract. And actually, the way it went to the jury on the first two questions of the jury verdict sheet that they say are inconsistent, the jury agreed that the policy coverage as sold originally did entitle term benefits and that the contract itself, when it was subsequently issued, didn't have the conversion rights. And by the July letter, they amended the written form contract to conform to what the parties had agreed to initially, which was conversion rights. And that's what we've maintained all along. On two separate occasions, an inquiry was made to Lincoln Benefit Life to confirm that these policies should have conversion right terms. The Lydia Trevino letter that was sent in July of 2000, making reference to the officers, Mr. Shelley, Stan Shelley, agrees that these policies should have conversion rights. That's the dispositive act on the behalf of Lincoln Benefit Life that conferred the conversion rights on the insured. Because even if, as they contend, Wilson sold a policy that didn't have conversion rights without authority, they selected the contract for him. Wilson sold the policy. There's no evidence he acted outside the scope of his agency other than an argument. And what appeared to have happened was that the form that Lincoln Benefit Life sent, that it selected for the policy and sent, didn't conform to what was originally sold. Mr. D'Antonio, we're applying New York collateral estoppel law. Is that correct? Yes, Your Honor. And as I understand, under New York law, for collateral estoppel to apply in the second case, the issues in the two cases have to be an identity. They need to be the same issue. Correct, Your Honor. And it seems to me this case comes down to whether or not what was before the court here is the same thing that needed to be or that was decided in New York. How are the issues the same when the company is attempting to make an argument for liability against their agent, giving their reasons, and as seems to have been described this morning, had to do with his representations to the ultimate insured about the characteristics of the policy? How are their issues against him decided in the same issue that was decided in the New York case? Yes, Your Honor, I can address that. Essentially, the New York case decided a number of issues which preclude a claim against Wilson under the theory of collateral estoppel. The evidence that was presented in the New York case on collateral estoppel... How are the issues the same? Isn't that what we have to... They're identical in the sense that it was Lincoln Benefit Life by its own actions that wrote the policy, that conversion rights on the insured, that on two or three separate occasions in the two years subsequent to the issuance of the policy, confirmed, verified, or as Judge Carlton raised, ratified the original sale of the policies. And if, in fact, there is a finding by the jury that Lincoln Benefit Life sold a policy that had conversion terms at the end of 10 years, and there was ample evidence that they did, there's no evidence whatsoever that the broker's actions had anything to do with the fact that these policies had conversion rights. That was litigated before the court in New York. There was no allegations in that the policy that was sold by Mr. Wilson was as a result of his negligence. They had the opportunity to raise that, and they didn't. And under collateral estoppel, I think the way it was established in New York was, if there's a representation made by a carrier, in this case, Lincoln Benefit, that there is coverage, which they did, and that the policy is interpreted to be 385, 5613, and confirmed also on 5615, if they make a representation to a policyholder, that's Lincoln Benefit, that you have coverage under these policies, and you have conversion rights, and the insured relies upon that, and the reliance is reasonable. In this case, it was because it was in writing, and it was on a letterhead, and this is exactly the way I argued the case below. The representations had been made that at the end of 10 years, and these representations were not by Jim Wilson, but rather by Lincoln Benefit Life, that at the end of 10 years, these policies had conversion rights. That, and to the extent that the final requirement is that the insured relied upon it to its detriment, which it did. It did nothing further. That collateral estoppel argument precludes any claim against Mr. Wilson, because for the jury to find collateral estoppel in the case below, they found it on the basis of Lincoln Benefit's actions that, in fact, ratified, confirmed, publicized to the insured that these policies had conversion rights. All Lincoln Benefit had to do, and was obligated to do, if the policies didn't have conversion rights, when given the chance in 2000 and 2002, was to respond, saying there were no conversion rights. And as Judge Coppolo points out in his decision, Mr. Wilson had no role in any of this. The policies were sold, and everything thereafter was decided by Lincoln Benefit. Lincoln Benefit acknowledged the conversion rights when the not a court officer, a corporate officer. I just want to address the argument that the jury verdict answers were inconsistent. And they're not, Your Honor. The first interrogatory that the jury answered simply says, correctly, that the plaintiff did prove that plaintiff had the right to convert the term policies at the time the policies were sold. They accepted the testimony of the policyholder and Mr. Wilson that that is what it was that he was selling. Remember, he didn't have the actual policy language. Subsequently, the contract that was issued by the carrier unilaterally did not or had an ambiguity as to that conversion right. And that's the ambiguity that was challenged at trial, saying this policy is not the policy that this was raised back in 2000. They immediately wrote a letter saying an officer of the company has confirmed that these policies have conversion rights. It was signed and it was sent to us. And the argument below was... So how was it modified? To the extent that the written contract was ambiguous on conversion rights, the Lydia Trevino letter modified the written contract to clarify the ambiguity by saying... But I thought the first question said it wasn't ambiguous that they did get conversion rights at the time the policies were sold. No, it doesn't. The first question says, did plaintiff prove... I'm reading it from the verdict sheet. No, you don't have to read it. They already found that the policy gave right to convert. Well, actually, they're not speaking per se about the policy. They're saying that the policyholder had the right to convert the term policies. And that could be based upon what was sold to them and what was told to them. Because at the time of the transaction judge, the contracts didn't exist. They didn't have a contract in hand when they sent the premium in. The contract, there's evidence... I elicited the testimony at trial. They sell it on a verbal approval of an application. You're saying the jury might've said they had a right to convert based on something outside the policies. At the time it was sold, because there was no policy at the time it was sold. If you go to a life insurance company to buy life insurance, they don't hand you a contract and you pay a premium. You submit a proposal, an application, they approve it, they bill you, you pay the premium, and then they send you the contract. So at the time this particular policy was sold, and this is what I argued to the jury, they went out and they sold this policy with conversion rights. And Jim Wilson testified he had the authority and permission from the underwriters at Lincoln Benefit who've never spoken in this case. You represented Lollitogs in the first trial. Now you represent Wilson? Correct. I represented Lollitogs. I tried the case against Lincoln Benefit at the first trial on all of these theories, presented all of the evidence. When Wilson made his claim for the premium and they sued him, he came to me. I cleared it with my client and I took the case. I knew the case better than anybody at that point. And I knew that Lincoln Benefit sold this policy. I knew that for years afterwards they ratified and confirmed that the policy had conversion rights. And they collected all of the premiums that they would have collected for these policies, which obligated them to pay the commission, as was decided. Nothing that happened in this case was the fault of Jim Wilson. Jim Wilson sold the policy. The insurance policy purchaser purchased the policy, read the contract that Lincoln Benefit selected to confirm the transaction and sent six months after it was sold, after the premiums have been paid. Read the policy and saw there was an ambiguity based upon the 70 years old. Inquired of Lincoln Benefit immediately as per the rules of the policy. And Lincoln Benefit issued a document that was a significant material legal document because it referenced an officer of the company and it was signed. And the policy itself said that if there's a mistake in this policy as we issue it, and it's going to be changed, it can't be changed by the agent. It can't be changed by verbal. It can't even be changed by a letter. It has to be an officer of the company and it has to be signed. And that's why the Lydia Trevino letter that was issued in 2000 is so important and she has it. So in your view is issue two or question two ends this case? A hundred percent. It can't not end the case because irrespective of, and even assuming arguendo, that Wilson didn't have the authority of underwriters to sell a policy that had conversion rights after 10 years, it was incumbent upon the carrier to communicate truthful and accurate information to the insured in response to an insured inquiry as to whether or there are conversion rights. That has nothing to do with Mr. Wilson. Putting aside the fact that it supports Mr. Wilson's position in this case, which is he didn't act without authority. He had authority to sell a policy with conversion rights. That's somewhat buttressed by the fact that in 2000 when the question was raised six months after the contract was delivered, or right after the contract was delivered, the carrier must have looked at their records. They had an officer come back and say that these policies do have conversion rights after 10 years. They put it in writing. They gave us the name of the officer and they signed the document. So even if the written contract that they issued didn't give the conversion right after 10 years, that letter modified the contract to give the conversion right. That's the beginning and end of this analysis. It doesn't go any further than that. If the carrier wanted to say that these policies were sold in error or Jim Wilson did something wrong, they would have to present evidence of that. There's no evidence of that. The evidence is all to the contrary because when they were asked directly in 2000 to clarify conversion rights, I don't think they willy-nilly without looking at their own internal files and underwriting files wrote a letter from an officer of the company saying these policies as sold do have conversion rights. They did it in such a manner that they knew would modify the written contract because they cite to the officer who's language as to how you would go about changing policy terms. So in 2000, they changed the policy term. That's what we argued. The policy being the written contract, not the terms of the underlying sale. We always maintain the term of the underlying sale had conversion rights. That's what the competitors were offering and that was important given Mr. Gindy's age that there be conversion rights because when he died, there needed to be $29 million to pay the shareholders and the shareholders were paying for the policy. They were the beneficiaries. So conversion rights were critical because whenever he died, that $29 million had to be paid. So they didn't want a 10-year term policy. They wanted a policy that would always be in force and in effect to do exactly what it did do. And if in fact Lincoln Benefit years later wants to take the position that Mr. Wilson didn't have the authority to sell this policy, that issue has been tried because it's already been established by interrogatory number two that they changed the policy in 2000. So even assuming arguendo that he didn't have the authority to sell it, we say he did, otherwise they wouldn't have changed the policy. They would have called it a mistake or an agent acting without authority. They endorsed it. They ratified it. They modified the policy to conform to exactly what it was that the insured and Mr. Wilson was saying they had agreed to initially and they've never put an underwriter on trial in either case or an affidavit from an underwriter that says that we don't agree that this was originally sold as a policy with conversion rights. They've never produced that. So the questions that were answered in the jury verdict sheet are not mutually exclusive. The jury found that the policyholder did have conversion rights at the time the policy was sold. Again, it's not the contract being delivered. Two, that by the preponderance of the evidence we proved that the July 13, 2000 facts modified the written contract that was given to us to conform to what we say had been sold to us from day one. Once the jury says yes to that, there's no further case here and any effort to not pay Mr. Wilson's commission which he was entitled to from the premiums that they collected would be unfair, unjust, not supported by the agency agreement and it's just an act of vindictiveness because the company doesn't like the fact that they were proven wrong and had to pay $29 million in death benefits on a policy and we feel there's no legal or on those additional premiums they collected in this case. That's the essence of our argument. Thank you, Mr. Gosselin. Mr. Gosselin, your rebuttal. The jury in the New York case never considered whether Mr. Wilson breached his agency agreement. His violations of that agreement just weren't part of that case. There wasn't any reason for that to come up in that case. What other violations are alleged in this suit besides the nature of the agreement? It's essentially the entire manner in which the policy is sold. What Mr. D'Antonio is saying is only partially true. The way insurance policies are sold, an insurance company like Lincoln Benefit appoints producers who are licensed under whatever the local law is and Mr. Wilson has appointments with multiple insurance carriers, companies like Lincoln Benefit. His obligation is to go sit down, meet with his clients, find out what do they need, what type of policy do they need, how much do they want to pay for it, what are the different features that make sense for their particular plan. This is especially true when we're dealing with high net worth people. Tell me again what you say the essence of the damages are that you seek in this lawsuit. This policy, if Lincoln Benefit didn't lose the underlying case and have to give the benefit of convertible policies, Lincoln Benefit would have collected substantially more premiums in years 10, 11, and 12 before Mr. Gindy died than they did because the jury gave them the benefit of conversion policies. They would have collected $15 million more in premium than they actually collected. But the jury, from the evidence it appears that your jury gave them the benefit of the conversion because your company said the policy provided for conversion. Respectfully sir, I don't think that's what happened in the underlying case. In the underlying case, Mr. D'Antonio, I was not involved, Mr. D'Antonio was, I've become an admirer of his work, I've read and studied his closing argument, and he argued to the jury that you have to find in favor of the the policy owners because they thought they were buying convertible policies and why did they think that? Because that's what Jim Wilson told them. That's what he told them. In our case, we're pointing out that Jim Wilson was told by us that these policies were not convertible. We gave him policy specimens so he can see the exact terms of the policy. We gave him multiple illustrations that say clearly on the front of them, these policies are not convertible if you're over the age of 70. And we asked Mr. Wilson in his deposition in this case, why didn't you adhere to those warnings in all of these documents telling you that these policies weren't convertible? And he said, ah, I don't pay any attention to that stuff. That was his mistake. What then is the effect of the letter? Well, and I think, I mean, candidly, I don't think question one, I think the judge just simply got it wrong on question one. Question two, that's a little bit different. And I do think that if the jury was given the question of, you know, was this a ratification, then there would be a collateral estoppel argument. But we're sitting here wondering whether that could be deemed a ratification. Well, that's why I asked you, what else would they have to find other than that the letter gave the plaintiffs the right to convert? Because that's what you're arguing is Wilson gave them a right to convert that wasn't in the policy. And what more do they have to find in order to ratify what you say Wilson did wrong? If you could give us that, that might help. Yeah, I will try. You know, hypothetically. No, in this case, not hypothetically. In this case, what more would they have to find to ratify what Wilson did? What happened in this case was in 2003, in 2003, the company received a request to convert the policies. And they said, sorry, you can't convert these because you don't have that provision. Then they said, hey, what about this fax? What about this fax? I think if you look at that fax, you can say, I understand why you thought that gave you the right to convert. I don't think the company was ratifying what Wilson did. I think the jury found, okay, they're allowed to rely on that fax. I think that's what happened here. Of course, it's a little bit ambiguous. It doesn't say Mr. Wilson can convert. It actually reiterates the language in the policy, but it has his name on it and it has his age on it. And if you're a policyholder and you're not sophisticated, you have this fax, maybe you can rely on that. But that was not Lincoln Benefit saying, hey, we agree these policies are convertible. Well, but the jury found that. The jury found Lincoln Benefit gave them the right to convert in that letter. They did, but they also found that the policies were already convertible. I think all of these are worthy arguments to defend this case, but these are not collateral estoppel arguments because the jury was not asked to decide ratification. That's the problem. The question, what they're essentially trying to say is that our, I mean, I think they agree that the question of Wilson's, whether he breaches agency agreement wasn't really in the underlying case. What they're saying is that we can't go out, we can't complain that he caused our damages because we caused those damages ourself. And that's a, like, that's fine, but you can't say that based on collateral estoppel. We cited to the Pan Am decision. Your time's expired. Thank you very much. Thank you, Mr Gosselin and you as well, Mr D'Antonio. We appreciate the arguments you provided to the court this morning. It's helpful in resolving the case and appreciate the briefing as well. We'll take the case under advisement. Thank you.